Ramzi Abadou (SBN 222567)
ramzi.abadou@ksfcounsel.com
KAHN SWICK & FOTI, LLP
505 Montgomery Street, 10th Floor
San Francisco, California 94111
Telephone: (415) 874-3047
Facsimile: (504) 455-1498

Melinda A. Nicholson
melinda.nicholson@ksfcounsel.com
Michael J. Palestina
michael.palestina@ksfcounsel.com
KAHN SWICK & FOTI, LLC
206 Covington St.
Madisonville, LA 70447
Telephone: (504) 455-1400
Facsimile: (504) 455-1498

*Counsel for Plaintiff Charles Rendelman*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES RENDELMAN, Derivatively on Behalf of AMERICAN APPAREL, INC. | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) |
| DOV CHARNEY, ALBERTO CHEHEBAR, DAVID DANZIGER, ROBERT GREENE, MARVIN IGELMAN, WILLIAM MAUER, and ALLAN MAYER | ) ) ) ) ) ) |
| Defendants, | ) ) |
| -and- | ) ) |
| AMERICAN APPAREL, INC., | ) ) |
| Nominal Defendant. | ) ) |

**Docket No.: 2:14-CV-5699**

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff, though his undersigned counsel, submits this Verified Shareholder Derivative Complaint in the name and on behalf of nominal defendant American Apparel, Inc. ("American Apparel" or the "Company") against certain directors and officers of American Apparel named herein (the "Individual Defendants," as defined below). Plaintiff bases his allegations on personal knowledge as to his own acts and on information and belief as to all other allegations, based upon due investigation by counsel, including: (a) review and analysis of public filings made by American Apparel and other persons with the Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications caused or allowed to be disseminated by certain of the Defendants and other persons; (c) review of news articles, shareholder communications, and postings on American Apparel's website concerning the Company's public statements; and (d) review of other publicly available information concerning American Apparel and other persons.

## INTRODUCTION AND OVERVIEW

1.       This is a shareholder derivative action brought by a shareholder of American Apparel on behalf of the Company against the Individual Defendants seeking to remedy their violations of state law during the relevant period that have caused and continue to cause substantial monetary losses to American Apparel and other damages, including damages to its reputation and goodwill. On behalf of American Apparel, this action seeks damages and corporate governance reforms to remedy the Individual Defendants' violations of law.

2.       American Apparel is a vertically integrated manufacturer, distributor, and retailer of branded fashion basic apparel and accessories for women, men, children and babies, based in downtown Los Angeles, California. The Company operates a wholesale business that supplies T-shirts and other casual wear to distributors and the imprintable industry, operates 246 retail stores in 20 countries, and operates a retail website, with approximately 10,000 employees.

3.      At all times relevant hereto, Defendant Dov Charney ("Charney") was the Chairman of the Board, Chief Executive Officer ("CEO") and a director of American Apparel—serving until June 18, 2014, when the Board voted to replace Charney as Chairman and notified him of its intent to terminate his employment as President and CEO for cause related to breaches of fiduciary duty and other improper conduct, which was to be effective following a 30-day period.  On July 9, 2014, the Company entered into a Standstill and Support Agreement with Standard General L.P. ("Standard") and Charney (the "Support Agreement"), which provided, amongst other things, that Charney will resign from the Board effective ten (10) days following the Company's filing of an Information Statement with the SEC and that a new Board committee will be formed to oversee the continuing investigation into alleged misconduct by Charney.  Charney will serve as a strategic consultant to the Company until the investigation is concluded.

4.      Throughout the relevant period, under Individual Defendants' direction and control, the Company failed to maintain adequate internal controls, failed to prevent its officers (from the CEO on down) from engaging in improper and illegal conduct, and ignored the red flags for years that indicated that Charney should be terminated for cause.  The Individual Defendants' failure to institute sufficient controls to prevent the brazen impropriety of Charney's conduct and failure to terminate Charney years ago constituted breaches of their fiduciary duties to the Company and its shareholders to exercise good faith and due care, to exercise proper oversight, and to otherwise act with loyalty to shareholders.  Those same duties were also egregiously breached when the Individual Defendants— despite being well aware of the specific terms of their financing agreements with the Company's creditors—nonetheless terminated Charney without immediately instituting a shareholders rights plan that would prevent Charney from amassing additional shareholder interest in the Company and before obtaining waivers of the provision in the credit agreement requiring that Charney remain at the helm of the

Company or the Company could be held in default.  As a result, the Company was held in default on one of its loan, which would trigger default on the Company's line of credit as well, Charney was able to increase his percentage ownership to 43%, and the Individual Defendants were forced to breach their fiduciary duties again by agreeing to the one-sided and conflicted Support Agreement.  While the Support Agreement provides the Company with needed financing, it also provides that all but two of the Individual Defendants would resign from the Board, that Charney will remain as a paid consultant of the Company while an investigation into his misconduct is conducted, and that the investigation would be overseen by a conflicted special committee of the Board constituted by two new appointees (one appointed by Charney's partner Standard and one appointed by the Company and Standard) and Individual Defendant Danziger, who has ignored Charney's misconduct for three years, all while chairing the Audit Committee of the Board.

5.      Charney himself breached his duties to shareholders by consciously and repeatedly engaging in improper and illegal conduct, exposing the Company to a multitude of lawsuits for a decade and increasing difficulty in obtaining financing and insurance on terms favorable to the Company, in addition to damaging the Company's reputation and goodwill.

6.      All of these acts and omissions have caused significant injury to American Apparel, for which Defendants should be held personally liable.  Aside from ruining the Company's reputation for honesty and integrity, Defendants have exposed the Company to very expensive legal costs to defend, investigate, and pay judgment or settlements in multiple, ongoing lawsuits and expensive financing and insurance costs due to Charney's ongoing misconduct.  In addition, the costs of replacing Charney as CEO, replacing almost the entire Board, paying Charney as a paid consultant until the investigation is complete, paying an outside party to conduct an investigation into his wrongdoing, and agreeing to the Support Agreement with Standard in order to avoid defaulting on its loans has wreaked

havoc of its own on the Company's finances. The Company will continue to face increased costs of borrowing or raising equity capital and insurance in the future. All of this has resulted in a palpable and deleterious impact on American Apparel.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to to 28 U.S.C. § 1332 (diversity of citizenship) in that Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.

8.      The Court has personal jurisdiction over each of the Defendants and Nominal Defendant American Apparel because each is either a corporation that conducts business in and maintains operations in this District or an individual with sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. Moreover, each Defendant has had extensive contacts with California as a director and/or officer of American Apparel or otherwise, which makes the exercise of personal jurisdiction over them proper.

9.      Venue is proper in this Court because American Apparel has a substantial presence in California State, and is headquartered in Los Angeles. Moreover, each defendant has had extensive contacts with California as a director and/or officer of American Apparel or otherwise, which makes the exercise of personal jurisdiction over them proper.

## PARTIES AND OTHER PERSONS

### A.    Plaintiff

10.      Plaintiff Charles Rendelman is and has been at all times relevant herein an owner and holder of American Apparel common stock. He is a citizen of Washington, D.C.

### B.    Nominal Defendant

11.      Nominal Defendant American Apparel, Inc. is a corporation

organized and existing under the laws of Delaware with its principal place of business located at 747 Warehouse Street, Los Angeles, California 90021.

### C.    Defendants

12.    Defendant Dov Charney ("Charney") has served as Chairman of the Board, CEO and a director of American Apparel since December 12, 2007, and served as President of American Apparel from December 2007 until October 2010. Prior thereto, Mr. Charney served as founder, director, chief executive officer and president of American Apparel's predecessor companies since their formation in Columbia, South Carolina, in 1989.  In exchange for his purported trust, loyalty, and fidelity to American Apparel, Charney received in salary, bonuses, stock awards, option awards, and other compensation approximately $1,065,444 in 2013, $14,495,868 in 2012, and $11,606,144 in 2011.  On June 18, 2014, the Board voted to replace Charney as Chairman and notified him of its intent to terminate his employment as President and CEO for cause.  The Board expected that the termination would be effective following a 30-day period required under the terms of Charney's employment agreement.  On July 9, 2014, the Company entered into a the Support Agreement with Standard and Charney, which provided, amongst other things, that Charney will resign from the Board effective ten (10) days following the Company's filing of an Information Statement with the SEC and that an independent Board committee will be formed to oversee the continuing investigation into alleged misconduct by Charney.  Charney will serve as a strategic consultant to the Company until the investigation is concluded.  Charney is a citizen of California.

13.    Defendant Alberto Chehebar ("Chehebar") has served as a director of American Apparel since February 2012.  Chehebar served as a member of the Nominating and Corporate Governance Committee of the Board (which has subsequently been split into the Nominating Committee and Enterprise Risk Management Committee) during the relevant period.  In exchange for his

purported trust, loyalty, and fidelity to American Apparel, Chehebar received approximately $80,000 in salary, bonuses, stock awards, option awards, and other compensation in 2013. Pursuant to the Support Agreement, Chehebar will resign from the Board effective ten (10) days following the Company's filing of an Information Statement with the SEC. Chehebar is a citizen of Columbia.

14.     Defendant David Danziger ("Danziger") has served as a director of American Apparel since June 2011. Danziger served as the chair of the Audit Committee of Board during the relevant period. Danziger currently continues to serve as the chair of the Audit Committee and serves as a member of Enterprise Risk Management Committee of the Board. In exchange for his purported trust, loyalty, and fidelity to American Apparel, Danziger received approximately $97,000 in salary, bonuses, stock awards, option awards, and other compensation in 2013. During the Company's Annual Meeting of Stockholders on June 18, 2014, Danziger was re-elected to the Board. After the annual meeting, on June 18, 2014, Danziger was appointed a Co-Chairman of the Board to replace Charney. Danziger is a citizen of Canada.

15.     Defendant Robert Greene ("Greene") has served as a director of American Apparel since December 2007. Greene served as the chair of the Nominating and Corporate Governance Committee (which has subsequently been split into the Nominating Committee and Enterprise Risk Management Committee) and as a member of the Compensation Committee of the Board during the relevant period. Greene currently serves as a member of the Nominating Committee and the Compensation Committee of the Board. In exchange for his purported trust, loyalty, and fidelity to American Apparel, Greene received approximately $89,500 in salary, bonuses, stock awards, option awards, and other compensation in 2013. During the Company's Annual Meeting of Stockholders on June 18, 2014, Greene was re-elected to the Board. Pursuant to the Support Agreement, Greene will

resign from the Board effective ten (10) days following the Company's filing of an Information Statement with the SEC. Greene is a citizen of California.

16. Defendant Marvin Igelman ("Igelman") has served as a director of American Apparel since July 2011. Igelman served as a member of the Audit Committee of the Board during the relevant period. Igelman currently continues to serve as a member of the Audit Committee of the Board. In exchange for his purported trust, loyalty, and fidelity to American Apparel, Igelman received approximately $87,000 in salary, bonuses, stock awards, option awards, and other compensation in 2013. Pursuant to the Support Agreement, Igelman will resign from the Board effective ten (10) days following the Company's filing of an Information Statement with the SEC. Igelman is a citizen of Canada.

17. Defendant William Mauer ("Mauer") has served as a director of American Apparel since November 2011. Mauer served as a member of the Audit Committee, the Compensation Committee and the Nominating and Corporate Governance Committee of the Board (which has subsequently been split into the Nominating Committee and Enterprise Risk Management Committee) during the relevant period. In exchange for his purported trust, loyalty, and fidelity to American Apparel, Mauer received approximately $88,000 in salary, bonuses, stock awards, option awards, and other compensation in 2013. Pursuant to the Support Agreement, Mauer will resign from the Board effective ten (10) days following the Company's filing of an Information Statement with the SEC. Mauer is a citizen of Canada.

18. Defendant Allan Mayer ("Mayer") has served as a director of American Apparel since December 2007. Mayer served as the chair of the Compensation Committee of the Board during the relevant period. Mayer currently serves as a member of the Compensation Committee and the Enterprise Risk Management Committee of the Board. In exchange for his purported trust, loyalty, and fidelity to American Apparel, Mayer received approximately $105,000

in salary, bonuses, stock awards, option awards, and other compensation in 2013. During the Company's Annual Meeting of Stockholders on June 18, 2014, Mayer was re-elected to the Board. After the annual meeting, Mayer was appointed a Co-Chairman of the Board to replace Charney. Mayer is a citizen of California.

19.    Defendants Charney, Chehebar, Danziger, Greene, Igelman, Mauer and Mayer are collectively referred to collectively throughout this Complaint as the "Individual Defendants" or the "Board." All of the named defendants, including nominal defendant American Apparel, are collectively referred to throughout this Complaint as the "Defendants."

## GENERAL FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

20.    The Individual Defendants had stringent fiduciary obligations to American Apparel and its shareholders.

21.    By reason of their positions as directors, officers, and/or fiduciaries of American Apparel and because of their ability to control its business and corporate affairs, the Individual Defendants owed American Apparel and its shareholders fiduciary obligations of loyalty, good faith, due care, disclosure, candor, and oversight, and were and are required to use their utmost ability to control and manage American Apparel in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of American Apparel and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit.

22.    Each director and officer of the Company owes to American Apparel and its shareholders the fiduciary duty to exercise good faith, loyalty, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and to uphold the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's true financial condition and prospects.

23.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of American Apparel, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial, and directorial positions with American Apparel, each of the Defendants had access to adverse, non-public information about the financial condition and operations of American Apparel.

24.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of American Apparel, and was at all times acting within the course and scope of such agency.

25.     To discharge their duties, the officers and directors of American Apparel were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of American Apparel were required to, among other things:

(a)     conduct the affairs of the Company in an efficient, businesslike manner, so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the Company's value;

(b)     properly and accurately guide shareholders and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's accounting and financial reporting would be true and accurate at all times;

(c)     ensure that the Company's revenue projections were based on appropriate support and documentation, and were routinely checked for accuracy;

(d)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations;

(e)     ensure that there were sufficient checks and balances in American Apparel's accounting and finance functions, and related functions, to prevent accounting irregularities, internal control problems, and/or overstatement of income, revenues and cash flow; and

(f)     ensure that no inaccurate information about American Apparel was released to the public that would tend to artificially inflate American Apparel's stock, and that would thus cause corresponding or greater harm to the Company's value when the truth was revealed.

26.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of American Apparel, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders.  The Individual Defendants were aware, or should have been aware, that those violations, absences of good faith, and the reckless disregard of duties posed a risk of serious injury to the Company.  The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining Individual Defendants who collectively comprised American Apparel's Board.

### SPECIFIC FIDUCIARY DUTIES OF DEFENDANTS

27.     Aside from their legally imposed duties as officers and/or directors of a publicly traded company organized under Delaware law, Defendants were also subject to particularized duties pursuant to specific policies in effect at

American Apparel.

## Duties Arising from American Apparel's Code of Ethics

28.      American Apparel's Code of Ethics (the "Code") imposes substantial duties upon all of American Apparel's officers, directors, and employees.  The Code states, in pertinent part:

**Honest, Ethical and Fair Conduct**

***Each person owes a duty to the Company to act with integrity.*** Integrity requires, among other things, being honest, fair and candid. Deceit, dishonesty and subordination of principle are inconsistent with integrity. Service to the Company never should be subordinated to personal gain and advantage.

Each person must:

- ***Act with integrity, including being honest and candid*** while still maintaining the confidentiality of the Company's information where required or in the Company's interests.

- ***Observe all applicable governmental laws, rules and regulations.***

- Adhere to a high standard of business ethics and not seek competitive advantage through unlawful or unethical business practices.

- ***Deal fairly with the Company's*** customers, suppliers, competitors and ***employees.***

- ***Refrain from taking advantage of anyone*** through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice.

***

**Compliance**

It is the Company's obligation and policy to comply with all applicable governmental laws, rules and regulations. It is the personal responsibility of each person to, and each person must, adhere to the standards and restrictions imposed by those laws, rules and regulations, including those relating to accounting and auditing matters.

**Reporting and Accountability**

***The Board of Directors or Audit Committee, if one exists, of [American Apparel] is responsible for applying this Code*** to specific situations in which questions are presented to it and has the authority to interpret this Code in any particular situation. [Emphases added.]

## Duties Arising from American Apparel's Corporate Governance Guidelines

29.    American Apparel's Corporate Governance Guidelines (the "Guidelines") outlines the responsibility and function of the Board, including specifically to oversee the Company's Chief Executive Officer.  The Guidelines state, in pertinent part:

**Role of Directors**

The business and affairs of the Company shall be managed by or under the direction of the Board. A director is expected to spend the time and effort necessary to properly discharge his or her responsibilities. …

**The Board's Goals**

The Board's goals are to build long-term value for the Company's stockholders and to assure the vitality of the Company for its customers, employees and the other individuals and organizations who depend on the Company.

To achieve these goals, ***the Board will monitor*** both the performance of the Company (in relation to its goals, strategy and competitors) and

*the performance of the Chief Executive Officer, and offer him or her constructive advice and feedback.* [Emphases added.]

30.      Further, the Guidelines provide that: "The non-management directors of the Company shall meet in executive session without management on a regularly scheduled basis, but no less than four times a year at each regularly scheduled Board meeting."

### Duties of the Audit Committee

31.      Defendants Danziger, Igelman and Mauer were members of the Audit Committee during the relevant time period.  Defendants Danziger and Igelman continue to serve on the Audit Committee.

32.      The primary purpose of the Audit Committee is to provide assistance to the Board in fulfilling its legal and fiduciary obligations with respect to matters involving the accounting, auditing, financial reporting, internal control and legal compliance functions of the Corporation and its subsidiaries.

33.      The Audit Committee's Charter further states that that the Audit Committee has, among other duties, the responsibility to:

- *Review the adequacy and effectiveness of the Corporation's accounting and internal control policies and procedures* through inquiry and discussions with the Corporation's independent auditors and management of the Corporation.

- Review with management the Corporation's administrative, operational and accounting internal controls, including controls and security of the computerized information systems, and *evaluate whether the Corporation is operating in accordance with its prescribed policies, procedures and codes of conduct.*

- Manage and oversee various risks faced by the Corporation and its subsidiaries, and assess, monitor and control such risks.

- Receive regular reports from the Corporation's management on (i) the risks presented by the Corporation's operations and (ii) the systems and processes that have been implemented to identify, mitigate and manage those risks.

- ***Review and evaluate the Corporation's practices regarding the identification, mitigation and management of risks***, including the risks identified by the other committees of the Board. Examples of areas of oversight may ***include***: (i) Financial and liquidity risks; (ii) Legal aspects of international operations, including fraud, bribery and corruption; (iii) Risks associated with manufacturing operations, including labor-related and regulatory matters, natural disasters and acts of terrorism; (iv) ***Compliance with laws and regulations***, including those related to product liability, health and safety, and environmental; (v) Appropriate insurance coverage; (vi) Protection of our intellectual property and security of our data; (vii) Antitrust and responses to competition; (viii) ***Human resource matters, including compliance with employment policies of the Corporation; and (ix) Public policy, social responsibility and general reputation***.

- ***Meet annually with the general counsel, and outside counsel when appropriate, to review legal and regulatory matters***, including any matters that may have a material impact on the financial statements of the Corporation.

- ***Review the policies and procedures with respect to officers' expense accounts and perquisites***, including the use of corporate assets.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT    14

- ***Review the Corporation's program to monitor compliance with the Corporation's Code of Ethics***, and meet periodically with the Corporation's General Counsel to discuss compliance with the Code of Ethics. [Emphases added.]

**Duties of the Nominating and Corporate Governance Committee Charter**

34.    Defendants Chehebar, Greene, and Mauer were members of the Nominating and Corporate Governance Committee (which has subsequently been split into the Nominating Committee and Enterprise Risk Management Committee) during the relevant time period.

35.    The primary purposes of the Nominating and Corporate Governance Committee are:

[T]o identify, and to recommend to the Board, individuals qualified to serve as directors of the Corporation, as the chief executive officer of the Corporation and on committees of the Board; to advise the Board with respect to the Board composition, procedures and committees; to develop and recommend to the Board a set of corporate governance principles applicable to the Corporation; to oversee and approve the evaluation of the Board and the Corporation's management; and to lead the Board in its annual review of the Board's performance.

36.    The Nominating and Corporate Governance Committee's Charter states that the Committee has, among other duties, the responsibility to:

- To review the suitability for continued service as a director of each Board member when his or her term expires and when he or she has a change in status, including but not limited to an employment change, and to recommend whether or not the director should be re-nominated.

- To develop and recommend to the Board a set of corporate governance principles for the Corporation, which shall be

consistent with any applicable laws, regulations and listing standards. At a minimum, the corporate governance principles developed and recommended by the Committee shall address the following:

(i)     Director qualification standards.

(ii)    Director responsibilities.

(iii)   Director access to management and, as necessary and appropriate, independent advisors.

(iv)    Director compensation, including principles for determining the form and amount of director compensation, and for reviewing those principles, as appropriate.

(v)     Director orientation and continuing education.

(vi)    Management succession, including policies and principles for the selection and performance review of the chief executive officer, as well as policies regarding succession in the event of an emergency or the retirement of the chief executive officer.

(vii)   Annual performance evaluation of the Board.

- To consider any other corporate governance issues that arise from time to time and to develop appropriate recommendations for the Board.

- The Committee shall be responsible for overseeing the evaluation of the Board as a whole and management and shall evaluate and report to the Board on the performance and effectiveness of the Board. The Committee shall establish procedures to allow it to exercise this oversight function.

The Committee shall evaluate and recommend termination of membership of individual directors in accordance with the Board's

corporate governance principles, for cause or for other appropriate reasons.

### Duties of the Compensation Committee

37.     Defendants Greene, Mauer, and Mayer were members of the Compensation Committee during the relevant time period.

38.     One of the primary purposes of the Compensation Committee is "to oversee the Corporation's compensation and employee benefit plans and practices, including its executive compensation plans and its incentive-compensation and equity-based plans."

39.     The Compensation Committee's Charter states that the Committee has, among other duties, the responsibility to:

- To evaluate annually the performance of the Chief Executive Officer in light of the goals and objectives of the Corporation's executive compensation plans and to review and recommend the Chief Executive Officer's compensation level, including annual salary, bonus, equity grants, performance-related pay, perquisites or other personal benefits, retirement benefits, deferred compensation, tax gross-ups, supplemental executive retirement plans, severance payments, change-in-control agreements and all awards of shares or share options based on this evaluation for approval, either as a committee or together with the other Independent Directors. In determining the long-term incentive component of the Chief Executive Officer's compensation, the Committee shall consider all relevant factors, including the Corporation's performance and relative stockholder return, the value of similar awards to chief executive officers of comparable companies, and the awards given to the Chief Executive Officer of the Corporation in past

years.  The  Committee  may  discuss  the  Chief  Executive Officer's compensation with the Board if it chooses to do so.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

40.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct. They have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

41.    The Individual Defendants collectively and individually initiated a course of conduct that was designed to and did partially conceal and condone that Defendant Charney was consistently engaging in wrongful and illegal conduct which would negatively impact American Apparel's finances, reputation and goodwill.

42.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of state law, including breaches of fiduciary duty.

43.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by purposefully or recklessly failing to curb Charneys misconduct and letting him remain in a position of power at the Company where he could continue to engage in improper conduct. Because the actions described herein occurred under the Board's authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

44.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions

to substantially assist the commission of the wrongdoing complained of herein, the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

### A.    Corporate Background

45.    American Apparel was founded by Charney in 1998.  On July 22, 2005, a "blank check" company named Endeavor Acquisition Corp. ("Endeavor") formed under Delaware law to acquire an operating business.  On December 12, 2007, Endeavor consummated the acquisition of American Apparel, Inc., a California corporation and its affiliated companies and changed its name to American Apparel, Inc.

46.    American Apparel is a vertically integrated manufacturer, distributor, and retailer of branded fashion basic apparel and accessories for women, men, children and babies, based in downtown Los Angeles, California. Since inception, the Company has operated a wholesale business that supplies T-shirts and other casual wear to distributors and the imprintable industry.  In October 2003, American Apparel opened its first retail store in Los Angeles.  In 2004, the Company began online retail operations, and opened its first retail stores in Canada and Europe. Since 2005, American Apparel has opened stores in Asia, Australia, Israel, Latin America, and have further expanded throughout the United States, Canada, Europe, and Asia. All of the Company's retail stores sell the Company's apparel products directly to consumers.  As of February 28, 2014, the Company had approximately 10,000 employees and operated 246 retail stores in 20 countries.   The Company also operates an e-commerce website with 12 different localized online stores in seven languages that serves customers from 30 countries worldwide.

47.     American Apparel manufactures domestically and is vertically integrated. The Company conducts its primary apparel manufacturing operations out of an 800,000 square foot facility in the warehouse district of downtown Los Angeles, California. The facility houses American Apparel's executive offices, as well as cutting, sewing and warehousing operations. American Apparel conducts knitting operations in Los Angeles and Garden Grove, California, which produce a majority of the fabric we use in our products. American Apparel also operates dye houses that currently provide dyeing and finishing services for nearly all of the raw fabric used in production. American Apparel operates a fabric dyeing and finishing facility in Hawthorne, California. It also operates a cutting, sewing and garment dyeing and finishing facility located in South Gate, California. American Apparel operates a fabric dyeing and finishing facility located in Garden Grove, California, which also includes cutting, sewing and knitting operations. Since 2013 American Apparel has conducted its warehousing and distribution operations out of La Mirada, California.

**B.    Charney's Repeated Misconduct Leads to Multiple Lawsuits Against the Company, While the Board Looks the Other Way**

48.     For years, American Apparel has been plagued with allegations, lawsuits, and official proceedings claiming that Charney engaged in misconduct and sexual harassment—more than enough for the Board to take action years ago to terminate Charney from his positions at the Company.

49.     Much of the details concerning these suits are not publicly-available, since American Apparel requires that its employees all sign mandatory agreements to submit their claims, including sexual harassment claims, to arbitration, which unlike regular court cases and jury trials are usually closed proceedings. Some employees have been required to sign documents waiving their right to bring any claim against the Company at all. The agreements further provide that the arbitration proceedings, including the outcomes and any

settlements, were to be kept confidential.  Employees are also required to agree to not disparage Charney or the Company and cannot speak to any news media with prior approval.  The purpose of these agreements was obviously intended to curtail the filing of suits to begin with—since the Company could file an up to $1 million counterclaim under the disparagement clause—and to ensure that the details of these suits would not become public, allowing Charney and the Board to hide from the public and shareholders the full extent of Charney's misconduct and illegal activity.  Because of these legal tactics, it is unknown how many sexual harassment and other claims have been or could have been brought against Charney.  But what information is known about the actions that have been brought clearly evidence a pattern of uncurbed improper and/or sexually harassing conduct by Charney for at least the last decade.

50.   For example, in 2004, during an interview with female reporter Claudine Ko for a profile that would run in the June/July 2004 edition of the magazine *Jane*, Charney masturbated in front of Ko on "eight or so" occasions and on one occasion received oral sex from a female employee in Cho's presence. Charney also admitted to having "wanted" a female employee in the Montreal office, stating in response to the question, "It never causes drama," that "Damn right it does.  You gotta be very careful – certain girls can handle it, certain can't. … I'm not saying I want to screw all the girls at work – I'm not a f—kin' madman. But if I fall in love at work, it's going to be beautiful and sexual."

51.   In 2005, Mary Nelson, a former sales manager, brought a claim against Charney and the Company for sexual harassment and wrongful termination in state court in California.  Nelson's suit included allegations that Charney attended meetings in his underwear, exposed himself, and called women vulgar names.  In 2006, during a deposition for the case, Charney testified that he once hosted a meeting wearing nothing but a sock over his privates and would walk around the office in his underwear.  In response to the question of what Charney

thought of the word "slut," he stated, "You know, there are some of us that love sluts. You know, it's not necessarily—it could be also be an endearing term."

52.    In 2008, Nelson, Charney and the Company entered into a settlement agreement, by which Nelson would be paid $1.3 million, subject to certain provisions, which included nondisclosure of the $1.3 million payment, an agreement to enter into an arbitration with an arbitrator selected and paid for by the Company with "foreordained facts and a predetermined award, which would be followed by the issuance of a misleading press release" that would state that the arbitrator had found Charney blameless.  The settlement agreement also contained an arbitration clause.  After counsel for Nelson refused to attend the sham arbitration, the Company and Charney requested that the court issue an order compelling arbitration concerning two alleged breaches of the settlement agreement by Nelson, namely Nelson's refusal to participate in the sham "arbitration" provided for in the settlement agreement and Nelson's purported violation of the confidentiality clause in the settlement agreement.  After the trial court denied the Company and Charney's request to compel arbitration concerning the settlement agreement, the Company and Charney appealed.  On October 28, 2008, the Court of Appeal of the State of California Second Appellate District in *Nelson v. American Apparel, Inc., et al.*, B205937, held that the parties were required to arbitrate Nelson's purported breaches of the agreement, while noting that the provisions of the settlement agreement had provided for a "deceptive procedure" that was "potentially illegal[]" and further stated that, "if this appeal involved a petition to compel the resumption of the 'arbitration'" of the underlying claims as provided for in the agreement, "[t]here would be considerations of illegality, injustice, and fraud which would affect our powers as a court of equity to enforce the 'arbitration' contemplated."  Thereafter, the Company questionably stated that a settlement agreement was entered into with Nelson that purportedly did not provide her with any monetary compensation.

53.     In February 2006, a former employee names Sylvia Hsu filed a discrimination claim, alleging that she has been sexually harassed and constructively discharged as a result of the sexual harassment and hostile work environment, with the Los Angeles Equal Employment Opportunity Commission ("EEOC").  In March 2007, the EEOC expanded its scope of investigation to include other employees who may have been sexually harassed.  In August 2010, the EEOC issued a determination that "***reasonable cause exists to believe [American Apparel] discriminated against Ms. Hsu and women, as a class, on the basis of their female gender, by subjecting them to sexual harassment***." (Emphasis added.)  After this finding, in August 2013, the Company entered into a settlement with Hsu, agreeing to pay her an undisclosed amount.  In the settlement, the Company also agreed to "comply with our Policy on Sexual Harassment and Sexual Discrimination, which Policy was reviewed by the EEOC, and take certain administrative measures relating thereto."

54.     In 2008, a lawsuit alleging hostile sexual behavior by Charney in the workplace was brought my former employee Jeneleen Floyd.  Among the allegations in the lawsuit, Floyd alleged that Charney demanded that Floyd "pretend to masturbate" in his presence.  Floyd was forced to arbitrate her claims.

55.     In 2011, a former employee named Irene Morales brought a suit against Charney in New York state court, alleging that Charney sexually harassed Morales for months, forced her to perform oral sex on Charney in his New York apartment in 2008, and made her his "sex slave."  In response, the Individual Defendants caused the Company to state that Morales sued only "after making a number of extortion-like threats to expose the company to a threatened avalanche of litigation and negative publicity."  Morales's suit was sent to private arbitration by the court at American Apparel's request.

56.     Also in 2011, four former female employees of American Apparel, Kimbra Lo, Alyssa Ferguson, Marissa Wilson, and Tesa Lubans-

Dehaven, filed a lawsuit in Los Angeles County Superior Court against Charney and the Company alleging sexual harassment. The complaint alleged that Charney sent "sexual text messages" to Lo in July 2010 and masturbated during a phone call with Lo on the phone. The suit further alleged that Lo ignored Charney's calls and text messages until December 2010, when Charney offered her a modeling and photography job. When Lo arrived at Charney's apartment to discuss the position, Charney, who was wearing only a towel, allegedly "violently kissed her" and forced her to perform sexual acts. In response to this lawsuit, the Company was caused to state that the women were colluding to "shake down" Charney and the Company for money and that it had "voluminous evidence" that purportedly showed the allegations to be false. Indeed, during an interview with the *Los Angeles Times* after the news of this lawsuit surfaced, Charney showed reporters sexually explicit emails and text messages that has been purportedly been sent by some of the plaintiffs, in which the women asked Charney to pay for airfares and provide them with money, and photos of the women posing in the nude in suggestive poses, including one photo that included Charney. All of the claims in this suit were either settled or dismissed.

57.    In 2012, former store manager Michael Bumblis filed a lawsuit that claimed that Charney called him racial and homophobic slurs, chocked him, and rubbed dirt in his face because Charney was unhappy with the store's condition. In 2013, a California state court judge ruled that Bumblis's arbitration agreement with the Company was invalid and unenforceable because Bumblis could be liable for up to $1 million under the confidentiality and non-disparagement clause in the agreement. This case is ongoing, with the Company appealing the court's denial of the motion to compel arbitration.

58.    The Board for years turned a blind eye to these repeated instances of misconduct. Indeed, Defendant Mayer has been quoted by *The New York Times* as saying, in reference to the Board finally taking action to terminate Charney, as

detailed *infra*, that, "We were well aware when we did this that the first question most people would ask was, 'What took you so long.' … We were not blind and deaf to all of the allegations and the newspaper stories[, b]ut you can't take an action this serious simply on the basis of rumors and allegations."  Mayer further told *The Post* that, "We have heard for years allegations and rumors in newspaper stories that were not sufficient to take action.  But what came to our attention was not allegations and rumors but established fact."  Clearly, however, these instances rose beyond mere "rumors and allegations."  Beyond the fact that the bevy of lawsuits cost the Company millions of dollars in fees for settlements and attorneys' fees, there were enough facts developed in these cases to show that Charney was engaging in actual misconduct.  Clearly, as revealed by the original settlement agreement entered into with Nelson, the Company and Charney took advantage of the arbitration agreements with its employees and entered into possible sham and/or illegal settlement agreements with employees for years.   Indeed, the EEOC's 2010 determination that "reasonable cause exists to believe [American Apparel] discriminated against Ms. Hsu and women, as a class, on the basis of their female gender, by subjecting them to sexual harassment" was not simply rumor or allegation, but an ***official finding*** of a government agency.

59.    Moreover, Charney's actions and the onslaught of lawsuits against him negatively affected American Apparel's ability to raise finances.  Lenders were hesitant to work with American Apparel, and many refused to extend the Company credit at all.  Those who would work with American Apparel, would only agree to extend financing at exorbitantly high interest rates.  Similar problems plagued the Company's ability to obtain insurance at reasonable premiums.

## C.    The Board Finally Takes Action Against Charney

60.    It was only after the Company's financial situation had grown precarious – the Company's interest rates on some loans had shot up to as high as 20%, the Company posted a loss of $106 million in 2013, and the price of

American Apparel's stock has plummeted to a low of $0.47 per share in March 2014 from a high of over $15 in December 2007 – that the Board finally decided to take action against Charney.

61.     On June 18, 2014, the Company held its Annual Meeting of Stockholders, during which Defendants Danziger, Greene and Mayer were re-elected to the Board.  Later that same day, the Board voted to terminate Charney and the Company issued a press release entitled, "American Apparel Board Suspends Dov Charney as CEO and Declares Intent to Terminate Him for Cause; Names John Luttrell as Interim CEO."  The press release stated that:

> The Board of Directors of American Apparel, Inc. (NYSE MKT: APP) today voted to replace Dov Charney as Chairman and notified him of its intent to terminate his employment as President and CEO for cause. It is expected that the termination will be effective following a 30-day cure period required under the terms of Mr. Charney's employment agreement.

> The Board suspended Mr. Charney from his positions as President and CEO, effective immediately, pending the expiration of the cure period. At the same time, the Board appointed John Luttrell as Interim Chief Executive Officer. Mr. Luttrell, who has been with American Apparel since February 2011 and currently serves as Executive Vice President and Chief Financial Officer, will continue in those positions as well. Prior to joining American Apparel, Mr. Luttrell served as Executive Vice President and Chief Financial Officer of Old Navy, The Wet Seal and Cost Plus.

> Also effective immediately, the Board appointed Allan Mayer and David Danziger as Co-Chairmen to replace Mr. Charney as Chairman of the Board. In accordance with the terms of his employment agreement, the Board intends to request Mr. Charney's

resignation as a member of the Board concurrently with the effective time of his termination.

Mr. Mayer, who has been a member of the Board since the company went public in 2007 and has served as its lead independent director for the past three years, said the Board's decision to replace Mr. Charney grew out of an ongoing investigation into alleged misconduct.

"We take no joy in this, but the Board felt it was the right thing to do," Mr. Mayer said. "Dov Charney created American Apparel, but the Company has grown much larger than any one individual and we are confident that its greatest days are still ahead." …

As a result of the management changes, the Company may have been deemed to have triggered an event of default under its credit agreements and will be in discussions with its lenders for a waiver of the default.

62.    The Company filed an 8-K will the SEC the next day, providing more details concerning the termination of Defendant Charney and its implications for the Company's finances.  The 8-K stated, in pertinent part, that:

In connection with the suspension of Dov Charney as Chief Executive Officer of American Apparel, Inc. (the "Company") described under Item 5.02 below, the Company may be deemed to have triggered an event of default under the Credit Agreement, dated as of May 22, 2013, among the Company and Lion/Hollywood L.L.C. (the "Lion Facility"). Under the terms of the Lion Facility, in the event that Mr. Charney ceases to be the Company's Chief Executive Officer, an event of default occurs and the lenders may declare outstanding obligations to be immediately due and payable. An event of default under the Lion Facility would also trigger an event of default under

the Credit Agreement, dated as of April 4, 2013, among the Company and Capital One Business Credit Corp. (the "Capital One Facility"). We are in the process of notifying Lion and Capital One of Mr. Charney's suspension and are seeking a waiver of such event of default. There can be no assurance that that the requested relief will be granted on terms acceptable to us or at all. Unless we are able to secure a waiver, the lenders under the Lion Facility and the Capital One Facility are entitled to, among other things, accelerate the outstanding amounts under the facility. Any such acceleration under our credit facilities would have a material adverse effect on our liquidity, financial condition and results of operations, and could cause us to become bankrupt or insolvent.

63.     Neither the press release nor the 8-K filed with the SEC revealed the specific details of the reason why Defendant Charney was being terminated "for cause."  However, a news source obtained a purported copy of the termination letter that the Board sent to Defendant Charney, outlining that he was being terminated for breaching his fiduciary duty, violating company policy, and misusing corporate assets.  According to the news outlet *BuzzFeed*, the letter sent on behalf of the Board to Defendant Charney stated:

Dear Mr. Charney:

Pursuant to Section 7(a) of your Employment Agreement dated April 1, 2012 (the "Employment Agreement"), the Board of Directors of American Apparel, Inc. (the "Company") hereby provides notice that (i) you have willfully and continuously failed to substantially perform your job duties under the Employment Agreement and (ii) you have engaged in willful misconduct that has materially injured the financial condition and business reputation of the Company. Based on your failures and misconduct, the Board intends to terminate your

employment with the Company for cause effective July 19, 2014 unless you are able to fully effect a cure in accordance with the terms of the Employment Agreement.

The Board's investigation of your misconduct is ongoing and has been hindered by the fact that certain Information has not been made available to the Board. However, to date, the events and circumstances by which you failed to perform your job duties and the details of your willful misconduct include the following:

1.    Breach of Fiduciary Duty. As an officer and director of American Apparel, you owe fiduciary duties to the Company. Among other things, your fiduciary obligations require you to act in the best interests of the Company, to act in good faith and to refrain from conduct that amounts to self dealing or presents a conflict of interest You have violated the fiduciary obligations owed to the Company in several material ways. For example, you were aware of, but took no steps to prevent an employee under your direct supervision and control from creating and maintaining false, defamatory and impersonating blog posts about former American Apparel employees. You were in a position to prevent this conduct from occurring but, since it benefitted you personally, you allowed it to continue. Your failure to act was not in the best Interest of the Company. It exposed the Company to liability and at least in once instance, directly resulted in an arbitrator finding that the Company acted with malice. Your failure to act also directly resulted in one arbitrator finding that the Company was vicariously liable for the conduct of your subordinate. Those findings, in turn, exposed the Company to a significant punitive damages award. You engaged in similar misconduct with respect to several other former

American Apparel employees, resulting in material payments and probable future settlements of such claims.

We also recently learned that you presented significant severance packages to numerous former employees (including packages to REDACTED) to ensure that your misconduct vis-a-vis these employees would not subject you to personal liability. None of these severance packages were discussed with or approved by the Board of Directors. These severance packages were material expenditures of Company funds that were not in the best interests of the Company and instead were to protect you from personal liability for misconduct. Moreover, we were recently appraised that you engaged in misconduct - including the potential subordination of perjury - in a pending litigation matter and that your misconduct will undermine the Company's position in that case.

2.    <u>Violation of Company Policy</u>. You have violated numerous Company policies and have failed to take action to enforce the Company's policies in derogation of your obligations as Chief Executive Officer. As is evident from a number of recent court rulings and arbitrator awards and decisions, you repeatedly engaged in conduct that violated the Company's sexual harassment and anti-discrimination policy. Furthermore, you engaged in conduct that repeatedly put yourself in a position to be sued by numerous former employees for claims that include harassment, discrimination and assault.

In the recent past, you refused to participate in mandatory sexual harassment training and undermined the Company's policies by interrupting employee sexual harassment training mandated under California law. By engaging in such conduct, you violated the

Company's Code of Ethics which, among other things, requires you to deter wrongdoing and promote compliance with applicable law, rules and regulations. You also violated the Code of Ethics by failing to stop your subordinate from posting false and defamatory blogs as discussed above. Furthermore, on several occasions you have made derogatory and disparaging remarks directed at persons of certain ethnicities or related to their gender, sexual orientation or religious persuasions that are discriminatory and offensive and are not in accordance with Company policies.

3. <u>Misuse of Corporate Assets</u>. You have used corporate assets in an inappropriate manner and for personal, non-business reasons without approval of the Board. For example, you continue to seek reimbursement by the Company for personal services such as legal consultation and certain property rentals and related expenses for various employees/consultants. The Board has reason to believe that many of these expenses were not legitimately incurred to advance the interests of the Company. These funds were instead used for personal reasons and to advance your personal objectives. Additionally, you have used Company assets to make substantial severance payments to protect you from personal liability. You have provided to employees various salary Increases, bonuses, and commission payments that were not meant to reward exemplary performance or further the Company's interests. Instead, you authorized these payments to induce employees to sign release agreements that were aimed at protecting you from personal liability for your misconduct. These payments, like the severance payments discussed above, were incurred for personal reasons and not to advance the legitimate business interests of the Company. You also

have engaged in self dealing by purchasing travel for family members with Company funds. These self-dealing transactions were not approved by the Board.

Your misconduct has injured the Company's financial condition and business reputation. In terms of finances, your conduct has required the Company to incur significant and unwarranted expenses, including expenses associated with litigation and defense costs, significant settlement payments, substantial severance packages that were granted to employees, and unwarranted business expenses that you incurred for personal reasons. The Company's employment practices liability insurance retention has grown to $1 million from $350,000, causing an unacceptable level of risk for the Company, and the premiums for this insurance are well outside of industry standards. These risks and costs to the Company are a direct result of your actions. The resources American Apparel had to dedicate to defend the numerous lawsuits resulting from your conduct, and the loss of critical, qualified Company employees as a result of your misconduct are also costs that cannot be overlooked.

Your misconduct has also harmed the business reputation of the Company. This is illustrated by voluminous press reports describing your behavior and the fact that the Company has had a very difficult time raising capital and securing debt financing at reasonable rates because of your actions. Indeed, many financing sources have refused to become involved with American Apparel as long as you remain involved with the Company. When the Company has been able to secure financing, it has been required to pay a significant premium for that financing in significant part because of your conduct.

Based on the events and circumstances detailed above, you are hereby suspended and placed on administrative leave <u>effective today, June 18, 2014</u>. Your suspension and administrative leave will last until July 19, 2014 or until such earlier time as you are able to fully effect a cure of your misconduct. On July 19, 2014 we will inform you of out final decision concerning your employment status.

Effective immediately, you will be relieved of all of your job duties and obligations, including as President and Chief Executive Officer; your power to act on the Company's behalf is hereby suspended. During your suspension, you shall not, on behalf of the Company, negotiate or enter into contracts, disburse funds, make any statements on the Company's behalf to the press, public or vendors (or induce, condone or fail to prevent others from making such statements), attempt to communicate with current employees or former employees with continuing contractual obligations to the Company (including under severance arrangements), or disrupt or interfere in any way with the Company's operations. You remain subject to and must continue to abide by the Company's policies, including the Company's confidentiality and non-disparagement policy. You also remain subject to continuing obligations under federal securities laws (including the prohibition against unauthorized disclosure of, or trading while in possession of, material non-public information) and continuing fiduciary duties under state law. During your suspension, you are not permitted to access directly or indirectly the Company's computer systems or flies, use any of the Company's assets, or Interact with any of the Company's employees or former employees with continuing contractual obligations to the Company, visit the Company's facilities (including but not limited to its manufacturing facilities,

headquarters, distribution center, apartments and stores), or contact
vendors or landlords, unless you obtain advance written permission from
the Board of Directors and your request is tied directly to an attempt to
cure the violations and misconduct described herein. If you violate the
directives outlined in this paragraph, the Board will consider such
conduct an additional "cause" to terminate your employment. During
your suspension, you will continue to receive your monthly salary and the
other benefits required to be paid under your Employment Agreement.

The Board is continuing to investigate the scope and extent of your
misconduct. The Board reserves the right to notify you of additional
events and circumstances that constitute cause to terminate your
employment. The Board also reserves the right to supplement and amend
this notice as additional information is learned through the course of its
ongoing investigation into your actions.

64.     The article reprinting the contents of the termination letter further
stated that, while the Board told *BuzzFeed* "that it learned of new information this
spring that spurred an investigation, ultimately resulting in its decision to oust
Charney," a source told *BuzzFeed* that "the board has known about the allegations
set forth in the letter for some time, and that it's calling attention to them now
because American Apparel's finances have deteriorated so significantly."

65.     One of the instances of wrongdoing referenced in the termination
letter related to the sexual harassment suit brought in 2011 by Irene Morales,
described *supra*.  In this case, an arbitrator found Charney guilty of defamation for
failing to stop the publication of naked photographs of Morales on a blog that
purportedly was created and authored by Morales.  Morales claimed that the blog
posts defamed and harassed her and violated California laws that outlaw falsely
impersonating someone online.  While the arbitrator ruled against Morales on the

harassment claims, the Company reportedly had to pay her $1 million for defamation and violation of California law.

66.       But this was not the first time Charney used purported sexually explicit photos to attempt to discredit his accusers.  In fact, as noted *supra*, on March 25, 2011, the *Los Angeles Times* reported that during an interview with Charney after a sexual harassment lawsuit had been filed by four former employees, he showed reporters sexually explicit emails and text messages that has been purportedly been sent by some of the plaintiffs, in which the women asked Charney to pay for airfares and provide them with money, and photos, including photos of the women posing suggestively in the nude, including one photo that featured Charney himself.

67.       Even more egregious is that, even while faced with the litany of improper and illegal conduct outlined in the termination letter, the Board first offered Charney a four-year consulting job with the Company, paying $1 million per year.  It was only after Charney refused this offer did the Board terminate Charney.

**D.    The Fall-Out From Charney's Ouster**

68.       Charney began to immediately fight back against his ouster.  He filed an arbitration petition against the Company alleging wrongful termination and retaliation.  He had previously owned approximately 45% of the outstanding shares of the Company, but, due to recent fundraising efforts by the Company in form of additional stock offerings, at the time he received the termination letter his percentage ownership had been diluted to only 27%.  Charney began approaching possible partners to assist him in boosting his stake in the Company.  Standard General L.P. ("Standard") agreed to assist Charney.

69.       As revealed through a Schedule 13D filing with the SEC, on June 25, 2014, Charney entered into an agreement with Standard that provided that Standard would lend money to Charney in order for Charney to purchase American

Apparel stock. In return, in addition to paying interest, Charney agreed that his American Apparel shares would only be voted as agreed to between Charney and Standard, with Charney being allowed to vote the shares in favor of his election to the Board.

70. Pursuant to the agreement with Standard, Charney began buying additional shares of American Apparel stock. On June 27, 2014, Charney filed a Form 13D with the SEC revealing that he had increased his stock ownership in the Company to approximately 43%.

71. Also on June 27, 2014, Charney, using his purported authority as CEO, sent a letter to the Board calling a special meeting of the stockholders to be held in September 2014. At the meeting, Charney wanted the shareholders to vote on, amount other things, amending the Bylaws of the Company to increase the number of Board members to 15 and electing individuals to fill any of the vacancies created by the increase in the Board.

72. Only after Charney had purchased the additional stock, on June 28, 2014, did the Board announce that it had adopted a stockholder rights plan "poison pill" aimed at preventing Charney from amassing more shares and attempting to take control of the Company.

73. The Board was also unable to obtain a waiver of the term in the credit agreement requiring that Charney remain CEO of the Company from its creditor Lion Capital. On June 8, 2014, the Company's lender Lion Capital demanded repayment of a $10 million loan made to American Apparel (the "Lion Facility" described *supra*), claiming that the Company was in default when the Company terminated Charney. The Company argued that Charney was still technically CEO and, therefore, no default had yet occurred, as the 30-day period after the termination letter was sent would expire on July 19, 2014, at which point Charney's termination would be effective. Moreover, as revealed in the 8-K the Company filed after Charney's termination, an event of default under the Lion

Facility would also trigger an event of default for the Company's $50 million credit line (under which $30 million is drawn) with Capital One Business Credit Corp.

**E.    The Individual Defendants Enter Into to the Support Agreement**

74.    Under pressure from Charney trying to take over the Company and Lion Capital threatening the Company's financial future—and despite the fact that just days after the Board sent Charney the termination letter, on June 20, 2014, a video was released online showing Charney dancing nude in the presence of two alleged female employees—the day after receiving Lion Capital's notice of default the Board agreed to make a deal with Charney and Standard.

75.    On July 9, 2014, the Company filed an 8-K with the SEC announcing that it had entered into a Nomination, Standstill and Support Agreement (the "Support Agreement") with Standard and Charney.

76.    The Support Agreement provides that Standard will not acquire any additional shares of the Company's stock or call any special meetings of the Company's stockholders.  Standard further agreed to provide the Company with up to $25 million, in order to allow the Company to pay off the Lion Facility.  Indeed, in an 8-K filing with the SEC on July 18, 2014, it was revealed that, as of July 16, 2014, Lion Capital had assigned the Lion Facility to Standard.

77.    The Support Agreement also provides that five of the seven current Board members will "resign effective ten (10) days following the Company's filing of an Information Statement" with the SEC.  Only Defendants Mayer and Danziger will remain as members of the Board.  Mayer—who has served on the Board since December 2007 and ignored Charney's wrongdoing for 6 and a half years—and Danziger—who has served on the Board since June 2011, chaired the Audit Committee during the relevant time period, and ignored Charney's wrongdoing for 3 years—will also remain as Co-Chairman of the Board.  In order to fill the Board vacancies, Standard will appoint 3 new members

of the Board, and Standard and the Company will agree on the other 2 new Board appointees.  Charney agreed to not seek a Board seat.

78.        After the Board is reconstituted, the Support Agreement provides that a new committee will be constituted to "oversee the continuing investigation" into Charney's alleged misconduct (the "Suitability Committee").  The Suitability Committee will be comprised of Defendant Danziger, one Standard designee and one joint designee.  The 8-K filed with the SEC stated that:

> Based on the findings of such Investigation, the Suitability Committee will determine if it is appropriate for Mr. Charney to be reinstated as CEO of the Company or serve as any officer or employee of the Company or any of its subsidiaries.

> Mr. Charney agrees in the Support Agreement not to interfere with or attempt to influence the outcome of the Investigation, or access the Company's computer systems. Until the Suitability Committee makes its final determination, Mr. Charney will be entitled to receive his base salary as a consultant to the Company and will have no supervisory authority over any employees of the Company.

79.        Accordingly, Charney will continue to receive his base salary (which was $832,000 in 2013) during the pendency of the investigation, which is being conducted by an outside consulting group FTI Consulting Inc. ("FTI"). Moreover, the Suitability Committee that will utilize FTI's report in order to decide Charney's fate will be populated by three conflicted directors, including two new appointees, one of which will solely be appointed by Charney's new partner Standard, one of which will be jointly appointed by Standard and the Company, and Defendant Danziger, who has been a director since mid-2011 and chair of the Audit Committee and, accordingly, ignored Charney's wrongdoing for 3 years.

## **DERIVATIVE ALLEGATIONS**

80.      Plaintiff brings this action derivatively in the right and for the benefit of American Apparel to redress injuries suffered, and to be suffered, by American Apparel as a direct result of the Individual Defendants' violations of state law, including breaches of fiduciary duty and the aiding and abetting thereof.

81.      American Apparel is named as a nominal defendant in this case solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.  Plaintiff was a shareholder of American Apparel at the time of the transgressions complained of herein and continues to retain his American Apparel shares.  Plaintiff will adequately and fairly represent the interests of American Apparel and its shareholders in enforcing and prosecuting their rights.  Prosecution of this action, independent of the Board of Directors in place at the time this suit was filed, is in the best interests of the Company.

82.      The wrongful acts complained of herein subject, and will continue to subject, American Apparel to continuing harm because the adverse consequences of the actions are still in effect and ongoing.

83.      The wrongful acts complained of herein were unlawfully concealed from American Apparel's shareholders.

## **DEMAND FUTILITY**

84.      When this suit was filed, Plaintiff did not make any demand on the Board of American Apparel to institute this action since such demand would have been a futile and useless act because the wrongful acts complained of show an abdication by the Individual Defendants of their fiduciary duties of due care and oversight.  Such abdication included, but was not limited to:

(a)      failing to institute sufficient controls to prevent the brazen impropriety of Charney's conduct;

(b)     failing to terminate Charney years ago when his misconduct first became known;

(c)     terminating Charney before obtaining waivers of the provision in the Company's credit agreement requiring that Charney remain at the helm of the Company or the Company could be held in default

(d)     failing to immediately enact a "poison pill" to prevent Charney from amassing a larger percentage ownership in the Company after his termination; and

(e)     agreeing to the one-sided and conflicted Support Agreement.

85.     The misconduct of the Individual Defendants alleged herein was not, and could not have been, the product of a valid or good faith exercise of business judgment.

86.     As detailed above, the Individual Defendants were directly involved in the misconduct challenged in this action, by virtue of their respective positions on the Board and its Committees.

87.     American Apparel's Board of Directors is currently comprised of all of the Individual Defendants—Charney, Cheebar, Danziger, Greene, Igelman, Mauer, and Mayer.  If only four members of this Board of Directors are found not to be independent or disinterested, demand is excused as futile.

88.     Defendant Charney is incapable of objectively considering pre-suit demand to bring these claims, inasmuch as he was President and CEO of the Comapny, receiving extensive salary and other compensation, and continues currently as a paid consultant, and thus depends upon his position for his livelihood.  Accordingly, Charney lacks independence due to his interest in maintaining his executive position at American Apparel.

89.     Charney is further incapable of objectively considering pre-suit demand since the claims directly involve his misconduct, including his breaches of the Company's Code of Ethics and the fiduciary duties he owes to the Company

and its shareholders, and the failure of the Board to curb his misconduct and terminate him at an earlier point in time when his misconduct first became known.

90.     The Audit Committee Defendants (Danziger, Igelman and Maauer) similarly are disabled from objectively considering pre-suit demand to bring these claims, because as members of the Audit Committee during the relevant period, they face a substantial likelihood of liability for wrongdoing. The Audit Committee of the Board had oversight responsibilities for the Company's internal controls with respect to accounting and internal control policies and procedures, was required to ensure that the Company was operating in accordance with its prescribed policies, procedures and codes of conduct, and was charged with overseeing the Company's compliance with laws and regulations, human resource matters, and general reputation. It was their failures of oversight as Audit Committee members that allowed allowing Defendant Charney to misuse his position at the Company and engage in improper and illegal conduct.

91.     The Compensation Committee Defendants (Mauer and Mayer) similarly face a substantial likelihood of liability for wrongdoing, in that they had the responsibility for annually evaluating the performance of the CEO and they approved lavish compensation for Defendant Charney despite his ongoing misconduct justifying his termination for cause.

92.     The Nominating and Corporate Governance Committee Defendants (Chehebar, Greene and Mauer) similarly face a substantial likelihood of liability for wrongdoing, in that they had the responsibility for recommending individuals qualified to serve as directors and as the CEO of the Corporation, consider corporate governance issues of the Company, and overseeing the evaluation of the Board as a whole and management, including recommending termination of individuals when appropriate, yet the Committee ignored the numerous incidents of misconduct and illegal actions taken by Charney for years,

only supporting his termination once the Company's finances were in dire straits due to Charney's misconduct.

93.     Furthermore, the Individual Defendants breached the Company's own Corporate Governance Guidelines by failing to properly monitor and curb the improper actions of the Company's CEO.

94.     Moreover, the Individual Defendants, in approving the problematic Support Agreement, have demonstrated that their loyalty does not lie with American Apparel and its public shareholders.  They, therefore, are incapable of independently and disinterestedly evaluating a pre-suit demand to bring these claims.

95.     In addition, and as a result of their actions, Defendants Mayer and Danziger will continue to hold onto their positions of power, prestige and profit with the Company as directors and Co-Chairman.

96.     American Apparel has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants have not caused the Company to file any lawsuits against any Charney to attempt to recover for the Company any part of the damages it has suffered and will suffer thereby.

97.     Moreover, despite having knowledge of the claims and causes of action raised by Plaintiffs, the Individual Defendants have caused the Board to refuse to seek to recover for American Apparel for any of the wrongdoing alleged by Plaintiff herein.  There is no evidence that the Board ever subjected any of the Individual Defendants beyond Charney to disciplinary action, as required by the Company's own codes of conduct and other governing protocols.

98.     Furthermore, the American Apparel Board is still dominated and controlled by many of the same wrongdoers who continue to obscure their own misconduct, and will not take action to protect the interests of American Apparel

or its shareholders.  The present Board has refused, and will continue to refuse, to institute this action for the foregoing and following reasons:

(a)     The acts complained of herein constitute violations of fiduciary duties owed by the Board of Directors and these acts are incapable of ratification;

(b)     Certain of the known principal wrongdoers and beneficiaries of the wrongdoing complained of herein are in a position to, and do, dominate and control the Board of Directors.  Thus, the Board could not exercise independent objective judgment in deciding whether to bring or vigorously prosecute this action;

(c)     The acts complained of herein are illegal and improper and thus are acts incapable of ratification;

(d)     In order to bring this action for breach of fiduciary duty, abuse of control and fraud, the members of the Board of Directors would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their good friends and with whom they have entangling financial alliances, interests, and dependencies, which they would not do.  They therefore would not be able to vigorously prosecute any such action; and

(e)     The members of the American Apparel Board, including each of the Individual Defendants herein, receive substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board and their control of American Apparel. They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.  The Board members also have close personal or business ties with each other and are, consequently, interested parties and cannot in good faith

exercise independent business judgment to determine whether to bring this action against themselves.

99.    Additionally, each of the Individual Defendants face a sufficiently substantial likelihood of liability for the misconduct alleged herein, and, thus, there is a reasonable doubt as to his disinterestedness in deciding whether pursuing legal action would be in the Company's best interest.

100.    Demand on the seven member board was thus futile.

**COUNT I**
**(Derivatively Against the Individual Defendants for**
**Breach of Fiduciary Duty)**

101.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

102.    The Individual Defendants owed and owe American Apparel fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe American Apparel the highest obligation of loyalty, good faith, due care, oversight, fair dealing, and candor.

103.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, fair dealing, and candor.

104.    Each of the Individual Defendants had actual or constructive knowledge that Charney was consistently engaging in inappropriate and illegal conduct for years, causing harm to the Company, yet ignored his actions for years without taking any step to terminate him until the Company's financial situation was dire.  The Individual Defendants further took steps to terminate Charney immediately after Defendants Danziger, Greene and Mayer were re-elected to the Board without fully preparing the Company for the financial implications of his termination and enacting an appropriate shareholder rights measures to prevent Charney from amassing additional ownership percentage of the Company, leading the Company to agree to the problematic and conflictual Support Agreement.

These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

105.    The Individual Defendants caused or allowed American Apparel to lack requisite internal controls, and, as a result, Charney was able to engage in inappropriate and illegal conduct for years without proper oversight.

106.    Defendants failed to supervise, and to exert internal controls over, and consciously disregarded their responsibilities involving the Company.

107.    In addition, by their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting one another, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the corporate governance of American Apparel in a manner consistent with the operations of a publicly held corporation.

108.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, including their gross mismanagement and abuse of control, American Apparel has sustained significant damages, including the cost of defending against numerous lawsuits.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of American Apparel for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and abuse of control.

B.    Directing American Apparel to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote

amendments to the By-Laws and Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance policies, including measures to:

    i. Strengthen the Board's supervision of regulatory compliance by the Company, including the development of procedures for greater shareholder input into the policies and guidelines of the Board and Audit Committee;

    ii. Remove Defendants Danziger and Mayer from the Board and replace them with new members;

    iii. Mandate that the Audit Committee meet to review the Company's compliance with legal, regulatory, and ethical norms;

    iv. Permit American Apparel's shareholders beyond Standard and Charney to nominate at least five candidates to the Board of Directors;

    v. Enjoin the Suitability Committee from reviewing Charney's misconduct and future with the Company and appoint a truly neutral body to oversee the investigation and recommendation.

C. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

D. And such other relief as this Court deems just and proper.

# JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  July 22, 2014

Respectfully submitted,

KAHN SWICK & FOTI, LLP


By:        /s/ *Ramzi Abadou*

Ramzi Abadou (SBN 222567)

ramzi.abadou@ksfcounsel.com

KAHN SWICK & FOTI, LLP

505 Montgomery Street, 10th Floor

San Francisco, California 94111

Telephone: (415) 874-3047

Facsimile: (504) 455-1498


Melinda A. Nicholson

melinda.nicholson@ksfcounsel.com

Michael J. Palestina

michael.palestina@ksfcounsel.com

KAHN SWICK & FOTI, LLC

206 Covington St.

Madisonville, LA 70447

Telephone: (504) 455-1400

Facsimile: (504) 455-1498


*Counsel for Plaintiff Charles Rendelman*

## VERIFICATION

I, Charles Rendelman, hereby verify that I am a shareholder of American Apparel, Inc.(the "Company") and am ready, willing, and able to pursue this shareholder derivative action in the hopes of improving the Company and recovering damages for the Company caused by Defendants' misconduct. I have reviewed the allegations in the Complaint, and as to those allegations of which I have personal knowledge, I know those allegations to be true, accurate and complete. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation, and for that reason I believe them to be true. Having received a copy of the foregoing complaint, and having reviewed it with my counsel, I hereby authorize its filing.

Charles Rendelman

Dated: July 21, 2014